IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

DONIEL CARTER
3819 S. MINER ST. APT. #8
MILWAUKEE, WI 53221
   Plaintiff,

                      Case No.: 18-cv-727

  v.

STATE OF WISCONSIN, DEPARTMENT OF CORRECTIONS,
c/o SECRETARY OF THE DEPARTMENT OF CORRECTIONS
JON LITSCHER
3099 EAST WASHINGTON AVENUE
MADISON, WI 53704

ERIKA WATSON (F/K/A ERIKA GRANSELL)
1715 W WISCONSIN AVE.
APPLETON, WI 54914

JASON MEDEMA
c/o FOX LAKE CORRECTIONAL INSTITUTION
W10237 LAKE EMILY RD
FOX LAKE, WI 53933

TARA WEIDEMANN
c/o FOX LAKE CORRECTIONAL INSTITUTION
W10237 LAKE EMILY RD
FOX LAKE, WI 53933

MICHELLE KLAPPER
c/o FOX LAKE CORRECTIONAL INSTITUTION
W10237 LAKE EMILY RD
FOX LAKE, WI 53933

   Defendants.

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff Doniel Carter, by his attorneys, Davey & Goldman, by Lisa Goldman and Bruce M. Davey, and as and for their complaint allege and show the court as follows:

**NATURE OF THE CLAIM**

1. Plaintiff, Doniel Carter, brings this action pursuant to the Civil Rights Act of 1964 (as amended), 42 U.S.C § 1983, the Fourth, Eight, and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of Wisconsin, regarding a continuing course of conduct and/or actions beginning in March 2012 and continuing through Mr. Carter's release from incarceration.

2. Mr. Carter brings this action based upon the intentional, sexual touching of plaintiff by Defendant Watson, Defendant Watson's demands for Carter to perform degrading acts, and her adverse treatment of Carter.

3. Mr. Carter brings this action also based upon the deliberate indifference of the other officers to plaintiff's suffering at the hands of Watson and the other defendants' failure to protect Mr. Carter. Last, Mr. Carter suffered when he was transferred to another institution which increased his security restrictions of his housing, and intimidated the plaintiff before, during, and after recorded interviews of Mr. Carter regarding the actions of Defendant Watson.

4. The Defendants, acting individually, as well as jointly and severally, did cause Carter to be subjected to cruel and unusual punishment causing him emotional, and psychological injuries.

5. All Defendants upon information and belief were at all times herein correctional officers within the Department of Corrections, employed by and authorized to act on behalf of the State of Wisconsin.

6. Plaintiff Carter seeks compensatory and punitive damages, an award of attorney fees and costs, and any such additional relief as the Court deems proper.

## JURISDICTION

7. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and 1343(a)(3) and (4) as this action seeks redress for the violation of plaintiff's constitutional and civil rights.

8. Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

9. Venue is proper in the United States District Court for the Eastern District of Wisconsin, pursuant to 28 U.S.C. § 1391 (b)(2), in that this is the judicial district in which the events giving rise to the claim occurred.

## JURY DEMAND

10. Plaintiff demands a trial by jury in this action on each and every one of his claims.

## PARTIES

11. Plaintiff, Doniel Carter, is a citizen of the United States, and was at all times relevant herein a resident of the Department of Corrections, Fox Lake Correctional Institution and Waupun Correctional Institution and Racine Correctional Institution.

12. Defendant Erika Watson (f/k/a Erika Gransell) is a resident of the state of Wisconsin living at 1715 W. Wisconsin Ave., Appleton, Wisconsin.

13. Defendant Jason Medema is a resident of the state of Wisconsin and works at Fox Lake Correctional Institution, W10237 Lake Emily Rd, Fox Lake, WI 53933 and at all times material hereto held the rank of sergeant. Defendant, by counsel has requested his personal address not be listed.

14. Defendant Tara Weidemann is a resident of the state of Wisconsin and works at Fox Lake Correctional Institution, W10237 Lake Emily Rd, Fox Lake, WI 53933. Defendant, by counsel has requested her personal address not be listed and at all times material hereto held the rank of correctional officer.

15. Defendant Michelle Klapper is a resident of the state of Wisconsin and at all times material herein worked at Fox Lake Correctional Institution. Defendant, by counsel has requested her personal address not be listed and at all time material hereto held the rank of correctional officer.

16. At all times relevant herein, defendants violated rights clearly established under the Constitution of the United States, in particular under the Fourth, Eight, and Fourteenth Amendments, of which reasonable correctional officers and/or supervisors acting under their respective circumstances would have known.

## STATEMENT OF FACTS

17. Plaintiff, Doniel Carter, is a male and at all times material to this action, was an inmate under the supervision of the State of Wisconsin Department of Corrections.

18. Defendant Watson at all times material to this action was a Sergeant correctional officer at Fox Lake Correctional Institution, a prison located at W10237 Lake Emily Rd, Fox Lake, WI 53933.

19. Defendant Medema at all times material to this action was a Sergeant correctional officer at Fox Lake Correctional Institution.

20. Defendant Weidemann at all times material to this action was a correctional officer at Fox Lake Correctional Institution.

21. Defendant Klapper at all times material to this action was a correctional officer at Fox Lake Correctional Institution.

22. Upon information and believe Defendant Watson's husband at all times material to this action was a correctional officer at Waupun Correctional Institution located in Waupun, Wisconsin.

23. Upon information and belief Plaintiff Carter was transferred within the Wisconsin Prison system to Fox Lake Correctional Institution ("Fox Lake") in the month of March, 2012.

24. Plaintiff had a custom or habit of being a prison worker and continued to do so upon his transfer to Fox Lake.

25. Plaintiff's work duties included setting up and cleaning up from meals in addition to performing other janitorial jobs at the prison.

26. He enjoyed all the regular rights and privileges of an inmate at Fox Lake upon his arrival there.

27. Shortly after arriving he became acquainted with Sgt. Watson who supervised his work in Unit 10 while she worked third shift (10 p.m. to 6 a.m.) in his unit at Fox Lake.

28. At all times material hereto, Sgt. Watson was a personal friend of Defendant Tara Weideman.

29. Beginning on or about April of 2012 Sgt. Watson demanded from time to time that plaintiff Carter come with her to the kitchen or other private area in Unit 10 of Fox Lake to clean or perform some other legitimate task necessary for the function of the prison.

30. Sometimes while plaintiff Carter was in the kitchen, social worker office, or utility or janitor room or at some other location performing a necessary task, Sgt. Watson would demand Carter perform sexual acts, including but not limited to masturbating in front of her, performing cunnilingus on her, and engaging in intercourse.

31. While plaintiff Carter was in one of these various rooms in Unit 10 performing a necessary task, Sgt. Watson would demand Carter perform demeaning tasks such as licking her toes, taking off his shirt while he worked, and touching himself in ways that made him uncomfortable, such as touching his sexual organs, his anus, and allowing her to touch his body.

32. If Plaintiff Carter tried to refuse to go with Sgt. Watson upon her demand she would threaten him in some fashion such as writing a complaint, requesting he lose privileges, and similar threats.

33. Prior to May 17, 2012, Sgt. Watson admitted to Officer Weidemann that she had violated the fraternization policy by passing notes to Plaintiff Carter and that she was attracted to Plaintiff Carter.

34. From time to time during this time period Officer Tara Weidemann knew of Sgt. Watson's actions toward Plaintiff Carter and would assist Sgt. Watson in engaging in this conduct by providing a lookout, by passing notes to Plaintiff, and by ordering plaintiff to a particular room in unit 10 for the purpose of placing Plaintiff Carter in a room alone with Sgt. Watson.

35. On or about May 17, 2012, Sgt. Medema, Sgt. Watson and Officer Klapper worked third shift together on Unit 10 at Fox Lake. Third shift is from 10:00 p.m. until 6:00 a.m.

36. Sgt. Medema was considered the officer in charge on this shift even though Sgt. Watson had worked at the institution longer. Sgt. Medema was always Sgt. Watson's superior when they both worked together in Unit 10. Sgt. Medema was always officer Klapper's superior when she worked in Unit 10 third shift.

37. On May 17, 2012, Sgt. Watson was ordered to go on a medical trip with an inmate and left Unit 10 to perform this task.

38. While Sgt. Watson was outside the institution on the medical trip, Sgt. Medema came upon Sgt. Watson's personal backpack on or near the officer's desk in Unit 10.

39. Inside Sgt. Watson's backpack was a handwritten letter for plaintiff Carter.

40. Sgt. Medema found this letter and read some or all of it.

41. Sgt. Medema asked Officer Michelle Klapper to come observe and read the letter in Sgt. Watson's backpack.

42. Officer Klapper did observe the letter and read the first paragraph and perhaps more of the letter.

43. Either Sgt. Medema or officer Klapper called Lt. Ebert and asked her to come observe the letter.

44. Lt. Ebert came to Unit 10, observed and read the letter in Watson's backpack.

45. Lt. Ebert also emptied the contents of Watson's backpack and discovered other items of interest.

46. The letter was immediately confiscated, and Sgt. Watson was interviewed regarding the letter and the other contents of her backpack when she returned from the medical trip.

47. She was also walked out of the institution and placed on administrative leave pending an investigation. She was allowed to take her backpack but some of the contents were retained by Fox Lake, including the letter.

48. Sgt. Watson lied about who the letter was intended for. She indicated to Lt. Ebert before she was walked out of the institution that the letter was for a family member.

49. After she was walked out of Fox Lake, she immediately called defendant Tara Weidemann her co-worker and close friend.

50. She discussed the situation with Officer Weidemann and revealed to Weidemann that the letter was for plaintiff Carter.

51. She discussed with officer Weidemann the notes she had been passing to Plaintiff Carter for some time prior to this letter.

52. She discussed with officer Weidemann Watson's sexual interest in plaintiff Carter.

53. Watson discussed with officer Weidemann the long conversations she would have with plaintiff Carter while she worked in Unit 10.

54. She discussed with officer Weidemann the periods of time that Watson would be alone with plaintiff Carter.

55. She told officer Weidemann that she could or would lie about the letter and tell the institution that the letter was for a family member, not Carter.

56. She told officer Weidemann that she thought she would be fired because the letter mentioned that she had previously worked at Burke Institution in the context of how to evade discovery that Watson and Carter were conversing privately by letter.

57. Watson indicated to Weidemann that she was afraid to go home because her husband, Gransell, a prison guard working at Waupun, would question why she was not at work and would become very angry with her.

58. Weidemann told Watson she should resign to end the investigation.

59. From time to time over the next several weeks since the letter was discovered Watson and Weidemann would talk about the situation.

60. The letter stated: "you look so handsome, I like how you look. I leave you for a few days and look at how you change on me. So how am I going to picture you out of here? So you know if you put down a Milw address, the postmark has to say Milw too or it doesn't fly. When you have a "neutral" mail in 2 diff pieces in 1 env it gets

caught. They can look on computer and see how each person is related. But only 2 names are on there, one happens to already have my 1st name. So if I mailed it to your mom and she placed it inside and pushed it forward, it might work. If you were to go to Burke, it would be a little harder, they know me well."

61. DOC was notified by Medema and Klapper that other officers had witnessed Sgt. Watson spending significant time alone with Plaintiff Carter.

62. Specifically, Sgt. Medema stated in his report during the investigation that at the start of the shift on May 17, 2012, he observed Sgt. Gransell ("Watson") talking with inmate Carter for about 15 minutes in Carter's bunk area of 1035 B-wing.

63. He also stated that about a half hour later he again saw Sgt. Watson conversing with inmate Carter for another length of time in the A-B dayroom between the two cameras and directly against the washers and dryers.

64. Sgt. Medema reported that he asked Watson if Carter was giving her snitch information and he reported that Watson said "no." He reported that Watson said she and Carter go way back to when she started in corrections and that they were discussing another officer, Kuglin, and Medema noted that she shouldn't discuss other staff with inmates.

65. Sgt. Medema saw Watson conversing with Carter again later in the evening in the dayroom by the washers and dryers.

66. Sgt. Medema admitted that he had seen Sgt. Watson talking with Carter for long periods of time the previous two times that he worked with Sgt. Watson in the last few weeks.

67. Sgt. Medema admitted that when Watson is not working in Unit 10, Carter is sleeping by 10:15 p.m.

68. Officer Klapper asked earlier in the shift on May 17th, 2012 where Sgt. Watson was located and was informed by Sgt. Medema that "she was back by that inmate again, for the second time already before 10:30."

69. Officer Klapper already knew which inmate was referenced by this remark.

70. Officer Klapper had personally witnessed Sgt. Watson talking to plaintiff Carter for long periods of time in prior shifts. She described it as "(1 hour here or 45 minutes there different times of the night). This inmates' name is Doniel Carter"

71. Officer Klapper also asserted that other staff who had worked with Watson on unit 10 had also observed her talking to Carter for long periods of time.

72. It was commonly known that Sgt. Watson would fraternize with plaintiff Carter during her shifts on unit 10.

73. DOC learned that Plaintiff Carter only had two authorized family / friends listed as potential visitors, one of whom was the mother of his child, Erika, and his mother.

74. DOC immediately placed Plaintiff in Temporary Lock Up status following discovery of the letter in Watson's backpack and then transferred him to Waupun Correctional Institution.

75. Upon his transfer he was placed in solitary confinement and stripped of all privileges. He could not receive or send mail, he could not have recreation time, he could not see other inmates, he could not work, he could not watch t.v.

76. Plaintiff Carter remained in this status for approximately one month.

77. After a month Plaintiff Carter obtained some of his rights back and was eventually transferred to Racine Correctional Institution where he remained with all rights and privileges until his release.

78. During his time in lock up and Waupun he missed a court hearing at which a judge was going to reduce his sentence for assistance he provided to federal prosecutors in another matter to time served.

79. Upon information and belief the prosecutors involved in that matter recommended Carter's sentence be deemed served.

80. When Carter missed the hearing because of his locked-up status it was rescheduled for several weeks later and at that time the court reduced his sentence such that he would remain incarcerated for another year.

81. During his time in lock up status and in solitary confinement he was repeatedly subjected to interrogations regarding the letter found in Sgt. Watson's backpack.

82. Before, during, and after the interrogations he was warned as to how to answer the interrogation questions such that he did not reveal the treatment he endured from Sgt. Watson.

83. When he was not interrogated in the investigation officers at Waupun, the same institution at which Sgt. Watson's husband worked as an officer, would threaten him in the event he had engaged in sexual contact with Sgt. Watson.

84. To the extent that touching alleged above was sexually motivated, it was not for a legitimate purpose and Plaintiff Carter did not consent to being touched sexually.

85. Plaintiff Carter did not consent to perform degrading acts and those acts were not for legitimate penal purposes.

86. On several occasions Sgt. Watson or her daughter would try to visit Carter in prison.

87. Once Plaintiff Carter was released from prison, Sgt. Watson pursued him through various means of contact including but not limited to email, messenger, phone, and having her daughter text Carter.

88. On one occasion Sgt. Watson revealed to Carter a picture of herself which clearly depicts a tattoo she obtained which spelled Plaintiff Carter's first name, Doniel, a tattoo which should have been visible by her co-workers at Fox Lake Correctional Institution.

89. At no time during his incarceration or upon his release did plaintiff consent to inappropriate or sexual contact with Sgt. Watson.

## CAUSES OF ACTION
## AS TO DEFENDANT WATSON

90. Plaintiff Carter realleges the allegations in paragraphs 1 through 89 above.

91. Defendant Watson in her individual capacity, acting under color of state law, violated Plaintiff Carter's due process rights, protected by the Fourteenth Amendment, which include the right to bodily integrity. *U.S. v. Lanier*, 520 U.S. 259 (1997).

92. Defendant Watson in her individual capacity, acting under color of state law, violated Plaintiff Carter's Fourteenth Amendment equal protection rights in demanding that he perform degrading tasks or other tasks with threat of punishment if he refused to do so.

93. Defendants Watson in her individual capacity, and DOC under color of state law, violated Plaintiff Carter's Eight Amendment rights to be free of cruel and unusual punishment.

94. Sgt. Watson sexually assaulted Carter by forcing him to engage in sexual contact without his consent.

95. Defendant's actions caused plaintiff Carter pain and suffering, mental anguish, and emotional distress.

### AS TO DEFENDANTS MEDEMA, KLAPPER, AND WEIDEMANN
### FAILURE TO PROTECT
### DELIBERATE INDIFFERENCE

96. Plaintiff Carter realleges the allegations in paragraphs 1 through 95 above.

97. Defendants Medema, Klapper, and Weideman knew Watson was in violation of the fraternization policy by having continued, lengthy, alone and individual contact with plaintiff Carter.

98. The Fraternization policy exists for several reasons including the protection of inmates from staff.

99. The failure of Defendants Medema, Klapper, and Weidemann to act on their knowledge of a substantial risk of serious harm to Plaintiff by failing to report Watson's violation of the Fraternization policy violated plaintiff's Eight Amendment right to be free from deliberate indifference to his safety.

100. As a result of Defendants Medema, Klapper, and Weidemans' failure, Plaintiff was sexually assaulted and received emotional injuries and loss of rights, privileges, and amenities in prison.

101. Defendants' actions caused plaintiff Carter pain and suffering, mental anguish, and emotional distress.

WHEREFORE, Plaintiff requests that he be granted judgment against Defendants and he be awarded damages in an amount found reasonable by a jury for his emotional distress and mental anguish, and costs, expenses, and reasonable attorney fees.

Dated: May 9, 2018

DAVEY & GOLDMAN
Attorneys for Plaintiff
Doniel Carter

/s/ Lisa C. Goldman
Lisa C. Goldman, SBN: 1029893
5609 Medical Circle, Ste. 101
Madison, WI 53719
Phone: (608) 630-9700
Fax: (608) 205-5645

lgoldman@daveygoldman.com